WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4223–69. Filed March 23, 1971.

*Lawrence H. Kyte, Alan R. Vogeler,* and *Arthur K. Mason,* for the petitioner.

*Rodney G. Haworth,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's income taxes:

| Taxable year ended | Deficiency |
| --- | --- |
| Dec. 31, 1958 | $78,486.51 |
| Dec. 31, 1959 | 143,266.71 |
| Dec. 31, 1960 | 219,300.21 |
| Dec. 31, 1961 | 476,421.04 |
| Dec. 31, 1962 | 659,724.36 |
| Total | 1,577,198.83 |

The issues involved in this case are:

(1) Whether the loading portion of "premiums, deferred and uncollected" and "premiums, due and unpaid" is excludable from assets within the meaning of section 805(b)(4), I.R.C. 1954;[1] and

(2) Whether the increase in loading on "premiums, deferred and uncollected" and "premiums, due and unpaid" is excludable from premium income under section 809(c)(1), or deductible from such income under section 809(d).

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner is an Ohio corporation having its principal office in Cincinnati, Ohio, at the time it filed its petition herein. Its Federal income tax returns for the years 1958 to 1962, inclusive, were filed with the district director of internal revenue, Cincinnati, Ohio.

Petitioner is a mutual life insurance company organized and existing under the laws of the State of Ohio. Its operations and accounts are subject to the supervision and approval of the superintendent of insurance for the State of Ohio and, because it does business in numerous States, it is subject to periodic audit of its accounts by the National Association of Insurance Commissioners (NAIC), which acts on behalf of the insurance departments of the various States.

The tax returns filed in the years here involved were prepared on the same basis as was used on the annual statement required of life insurance companies by the NAIC, with some adjustments.

In life insurance, premiums are the agreed price for assuming and carrying the risk. Gross premium is the amount actually charged the insured and is composed of the net valuation premium and "loading." The net valuation premium on a particular policy is that amount of money which, using the mortality table and interest rate assumed for the policy, will be exactly sufficient to provide the benefits of the policy and is required by State law to be added to the policy reserve each year. "Loading" refers to an amount added to the net valuation premium for estimated administration, management, and operating expenses, contingencies, profits in the case of capital stock companies, and dividends in the case of mutual companies. The amount of "loading" results from an independent judgment of each particular company and may vary from company to company. Policyholders may pay premiums in semiannual, quarterly, monthly, or weekly installments. An additional amount is added when an installment method of paying the premium is elected.

---

[1] All references, unless otherwise specified, are to the Internal Revenue Code of 1954.

"Deferred and uncollected premiums" are the premiums on policies with premiums payable more often than annually which become due after December 31 of the calendar year and before the next policy anniversary date.

"Due and unpaid premiums" are premiums which are due to be paid before the end of the year, but which have not been paid by December 31. As required by law, all policies provide for a 31-day grace period for the payment of premiums after their due date, during which period the policy is carried in full force and effect.

"Deferred and uncollected premiums" and "due and unpaid premiums" are hereinafter sometimes referred to as due and deferred premiums.[2]

There is no obligation, legal or otherwise, on an insured to pay to the insurer due and deferred premiums. If the policyholder does not pay the premium in conformity with the provisions of the policy, the policy is lapsed after the grace period and appropriate adjustments are made.

Petitioner was required by the State of Ohio and by the NAIC to compute its reserves on the great majority of its life insurance policies on the assumption that premiums were paid up 1 year in advance on each anniversary date commencing with the issuance date of the policy, even though premiums were not usually paid in this manner. The reserves so computed were reflected as a liability of petitioner and, as required by the Internal Revenue Code of 1954, as amended by the Life Insurance Company Income Tax Act of 1959,[3] were taken into account in the computations required under sections 805 and 809 on the Federal income tax returns filed by petitioner for the taxable years 1958 to 1962, inclusive.

The NAIC annual statement treats deferred and uncollected premiums on a net basis. Item 17, on the assets page of the balance sheet, calls for the statement of "Life insurance premiums and annuity considerations deferred and uncollected" on a net premium basis. Exhibit 13 of the annual statement, which gives the detail of the assets, sets forth deferred and uncollected premiums on a net basis. It provides for a memorandum account to show the amount of loading excluded from the deferred and uncollected premiums. Item 16 of the liabilities page of the balance sheet calls for a statement of the " 'Cost of collection' on premiums and annuity considerations deferred and uncollected in excess of total loading thereon." As required by the NAIC annual statement, petitioner's annual statements showed net

---

[2] The parties have stipulated that "due and deferred premiums" should be the shorthand designation employed, but we note that the cases and the NAIC apparently refer to "deferred and uncollected premiums" as encompassing both classes of premiums.

[3] 26 U.S.C. sec. 801 *et seq.*, effective for taxable years beginning after Dec. 31, 1957.

premiums deferred and uncollected as an asset. Also in conformity with the form, petitioner's annual statement did not show loading as an asset.

In the summary of operations contained in the NAIC annual statements, line 1.1, "Premiums and annuity considerations," includes deferred and uncollected premiums on a gross basis. It (line 1.1) provides for the inclusion of such premiums at gross to be added to gross premiums collected during the year less deferred and uncollected premiums at gross as of the end of the previous year. Line 17, which is the "Increase in aggregate reserve for policies and contracts with life contingencies," removes from income the net portion of the deferred and uncollected premiums. Line 25 provides for the deduction of the increase in loading on deferred and uncollected premiums and also for the deduction of cost of collection of premiums in excess of loading on deferred and uncollected premiums. In determining net gain from operations, lines 8 through 26A of the Summary of Operations list various allowable deductions, including the deduction in line 25 for increase in loading on deferred and uncollected premiums. This deduction was claimed by petitioner on its Federal income tax returns in determining its net gain from operations. Exclusive of increases in loading, the petitioner deducted all expenses actually paid or incurred each year on its NAIC annual statements and Federal income tax returns.

In its income tax returns for the years involved, petitioner did not include any due and deferred premiums as an asset, but it now concedes that they should be so included in an amount equal to the net valuation premiums. In these returns, petitioner did include, as an income item, an amount of due and deferred premiums equal to the deductions for increase in loading and increase in reserves.

### OPINION

This case presents two issues relating to the interpretation and application of the Life Insurance Company Income Tax Act of 1959. 26 U.S.C. sec. 801 *et seq.* The Act was a comprehensive revision of the prior schemes for taxing the incomes of life insurance companies. See H. Rept. No. 34, 86th Cong., 1st Sess., pp. 1–8 (1959) ; S. Rept. No. 291, 86th Cong., 1st Sess., pp. 1–12 (1959).

Section 802(b) sets out a three-phase approach which is to be followed in computing a life insurance company's taxable income.[4] In

---

[4] SEC. 802. TAX IMPOSED.

(b) LIFE INSURANCE COMPANY TAXABLE INCOME DEFINED.—For purposes of this part, the term "life insurance company taxable income" means the sum of—

(1) the taxable investment income (as defined in section 804) or, if smaller, the gain from operations (as defined in section 809),

(2) if the gain from operations exceeds the taxable investment income, an amount equal to 50 percent of such excess, plus

(3) the amount subtracted from the policyholders surplus account for the taxable year, as determined under section 815.

arriving at taxable investment income and gain from operations, the 1959 Act recognizes that life insurance companies are legally obligated to keep policyholder reserves in order to meet future claims, that they normally add a significant portion of their investment income to these reserves, and that these annual reserve increments should not be subjected to tax. *United States* v. *Atlas Ins. Co.*, 381 U.S. 233, 235–236 (1965). The Act thus attempts to tax only those portions of investment income and premium income which represent profit to the company, legally available for distribution to policyholders or stockholders as dividends, as distinguished from those gains which, under State law, must be set aside to meet the company's future contractual obligations. *Jefferson Standard Life Insurance Co.* v. *United States*, 408 F. 2d 842, 844 (C.A. 4, 1969).

We note at the outset that we do not approach this case with a *tabula rasa*. Three Courts of Appeals, as well as this Court on two occasions, have decided similar cases involving one or both of the issues involved herein. *Franklin Life Insurance Co.* v. *United States*, 399 F. 2d 757 (C.A. 7, 1968); *Jefferson Standard Life Insurance Co.* v. *United States, supra; Western National Life Insurance Co. of Texas* v. *Commissioner*, 432 F. 2d 298 (C.A. 5, 1970), reversing and remanding 50 T.C. 285 (1968) as modified by 51 T.C. 824 (1969). In view of the detailed analysis contained in the various opinions in these cases, we are relieved of the necessity of exposition beyond what is essential to the articulation of our position herein.

The two issues requiring decision stem from certain propositions which are not in dispute: (1) That life insurance reserves are properly taken into account in computing the numerator of a fraction utilized in determining the amount to be eliminated from "investment income," subject to the so-called phase I tax; (2) that the annual increase in such reserves is a proper deduction in determining gain from operations, which is subject to the so-called phase II tax; (3) that such reserves include a purported liability in an amount computed on the assumption that premiums are paid up 1 year in advance on each anniversary date commencing with the issuance date of the policy; and (4) that, to the extent of such amount, a liability is recognized which does not reflect the normal requirements of accrual accounting.

The first issue to be resolved is the extent to which due and deferred premiums should be taken into account in computing the amount of "assets" as defined in section 805 (b) (4),[5] an amount which is in the

---

[5] SEC. 805 (b) (4). ASSETS.—For purposes of this part, the term "assets" means all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. For purposes of this paragraph, the amount attributable to—

 (A) real property and stock shall be the fair market value thereof, and

 (B) any other asset shall be the adjusted basis (determined without regard to fair market value on December 31, 1958) of such asset for purposes of determining gain on sale or other disposition.

denominator of a fraction whose numerator includes "life insurance reserves." The fraction is a key element in determining the policy-holders' share of investment income which is to be excluded from taxable investment income and consequently not subject to the so-called phase I tax. Obviously, the smaller the denominator, the larger the fraction and therefore the greater the amount to be excluded and the smaller the amount subject to tax. Respondent argues that the word "assets" should include the gross amount of due and deferred premiums. He bases his contention on the following syllogism: (1) Life insurance reserves are included in the numerator of the fraction; (2) those reserves include an amount attributable to due and deferred premiums computed, as previously indicated, on the assumption that premiums are paid 1 year in advance; (3) such an assumption having furnished the underpinning for the computation of an element in the numerator of the fraction, the same assumption should control the determination of the denominator of the fraction. Or, to put it another way, respondent contends that, since the liability represented by life insurance reserves is based on the premise that the item giving rise to such liability has been received, the same premise must be utilized in computing the assets which are subject to such liability.

We think respondent's syllogism proves too much. Initially, we point out that the assumption upon which respondent relies so heavily has its roots in the procedures of the NAIC and presumably the requirements of State law with respect to the necessity of establishing reserves. There is no indication in the statute itself or the legislative history that such an assumption was the foundation for the statutory provision permitting the liability, represented by reserves allocated to due and deferred premiums, to be taken into account. See H. Rept. No. 34, *supra;* S. Rept. No. 291, *supra;* H. Rept. No. 520, 86th Cong., 1st Sess. (1959) ; but see *Franklin Life Insurance Co.* v. *United States,* 399 F. 2d at 761. Only if we were to adopt an osmotic view of legislative intent could we say that the assumption in question was the foundation for legislative action and, even in such a circumstance, we would have to extend the process of osmosis from a determination of the composition of life insurance reserves to a determination of the meaning of the word "assets." This we are not prepared to do.

Section 818 (a) specifically provides:

SEC. 818. ACCOUNTING PROVISIONS.

(a) METHOD OF ACCOUNTING.—All computations entering into the determination of the taxes imposed by this part shall be made—
(1) under an accrual method of accounting, or
(2) to the extent permitted under regulations prescribed by the Secretary or his delegate, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

It seems to us that, by virtue of this provision, Congress clearly specified that, except to the extent otherwise provided, the accrual method of accounting was to control; indeed, it emphasized its mandate in this regard by limiting the broad delegation of power to prescribe regulations to "a combination of an accrual method of accounting *with* any other method permitted by this chapter (other than the cash receipts and disbursements method)." (Emphasis added.) Neither party herein disputes the proposition that, since petitioner had no legal right to collect due and deferred premiums, they would not normally be includable under an accrual method of accounting. Indeed, were it not for the specific provisions in section 805, permitting life insurance reserves to be taken into account, the portion of those reserves attributable to the liability, which would have come into existence if and when the due and deferred premiums had been paid, would also not be recognized under the accrual method of accounting.

In view of the foregoing, we are of the opinion that the fact that Congress injected a limited modification of the normal rules of accrual accounting with respect to life insurance reserves does not justify an expansive interpretation of the word "assets" in section 805(b)(4). To hold otherwise would in effect result in the creation for tax purposes of an otherwise nonexistent asset. In an analogous situation, we have only recently reaffirmed our refusal to permit respondent to utilize section 482 to allocate nonexistent income. *Huber Homes, Inc.*, 55 T.C. 598 (1971). Nor are we impressed with respondent's argument that adoption of his position is necessary to prevent distortion. In point of fact, whenever amounts are added to both a numerator and denominator, the fraction is distorted from what it would have been without the additions unless the amounts so added are in the same proportion as the other amounts utilized in determining the fraction. The siren song of symmetry which underlies respondent's argument regarding distortion is beside the point. Symmetry between income and deductions is not a necessary touchstone for determining the incidence of Federal income taxation, even where such symmetry is consistent with sound accounting practice. Cf. *Schlude* v. *Commissioner*, 372 U.S. 128 (1963); *American Automobile Assn.* v. *United States*, 367 U.S. 687, 692 (1961).

Perhaps there would be less distortion under respondent's method. Cf. our supplemental opinion in *Western National Life Insurance Co. of Texas*, 51 T.C. 824, 826–827 (1969). But this may not necessarily be

so and, in any event, we are not disposed to create an accruable asset simply because the statute specifically permits an otherwise nonaccruable liability to be taken into account. We so conclude, not because we consider the NAIC treatment binding upon us or respondent, but because, given the clear indication that the normal rules of accrual accounting should be applied to the taxation of life insurance companies, except as modified by statute, and the fact that the Life Insurance Company Income Tax Act of 1959 represents a carefully drawn, detailed framework of taxation in an unusually complicated area, we think that the word "assets"—a word of ordinary usage—should be given its accepted meaning. Cf. *Commissioner* v. *Brown*, 380 U.S. 563 (1965) ; *Hanover Bank* v. *Commissioner*, 369 U.S. 672 (1962) ; *University Hill Foundation*, 51 T.C. 548 (1969), on appeal (C.A. 9, July 14, 1969). In so concluding, we recognize that the three Circuit Courts of Appeals have reached a contrary decision (*Franklin Life Insurance Co.* v. *United States, supra; Jefferson Standard Life Insurance Co.* v. *United States, supra; Western National Life Insurance Co. of Texas* v. *Commissioner, supra*), but, after careful consideration, we respectfully decline to adopt their point of view.[6] We also recognize that the logic of our rationale is more consistent with our original decision in *Western National Life Insurance Co. of Texas*, 50 T.C. 285 (1968). However, in view of the fact that petitioner herein has conceded that due and deferred premiums should be included in "assets" to the extent of the net valuation premiums, i.e., with only the amount represented by loading excluded, we need now do no more than adhere to our supplemental decision in that case (51 T.C. 824) that the loading portion of due and deferred premiums should be excluded from "assets" as that term is used in section 805(b)(4) and we expressly leave open the question of reconsidering a return to our original position in that case. Moreover, in view of our rationale, we need not specifically address ourselves to the further argument made by petitioner that due and deferred premiums are assets, at least to the extent represented by loading, "used by it in carrying on an insurance trade or business" and/or have a zero basis so that they would, in any event, not be recognized as "assets" within the meaning of section 805(b)(4).

The second issue involved herein is whether the gross amount of due and deferred premiums should be included in "gross premiums"

---

[6] The three circuits which have passed on this issue are the Seventh, Fourth, and Fifth. Any appeal in the instant case would normally lie to the Court of Appeals for the Sixth Circuit (sec. 7482), thus making our recent decision in *Jack E. Golsen*, 54 T.C. 742 (1970), on appeal (C.A. 10, May 4, 1970), inapplicable. We are not convinced that these cases are distinguishable on the ground urged by petitioner, namely, that it used a system of determining net valuation premiums different from that which the Courts of Appeals assumed was being used by the taxpayers involved therein.

within the meaning of section 809(c)(1) [7] in determining gain from operations for purposes of the so-called phase II tax. Starting from the premise accepted by the parties that section 809(d) specifically permits a deduction, in determining gain or loss from operations, for th net increase in life insurance reserves, respondent advances the same syllogism to support his position that the entire amount of due and deferred premiums is encompassed by the phrase "gross premiums." This Court has not yet ruled on this issue (see our supplemental opinion in *Western National Life Insurance Co. of Texas*, 51 T.C. at 830) but one Circuit Court of Appeals has accepted respondent's position (*Jefferson Standard Life Insurance Co.* v. *United States, supra*) and another has indicated its agreement with this view although the particular issue was not before it and the taxpayer therein had conceded such an interpretation of the statute (see *Franklin Life Insurance Co.* v. *United States*, 399 F. 2d at 760). Our reasoning with respect to the includability of due and deferred premiums in "assets" for purposes of section 805(b)(4) applies with equal force to the interpretation of section 809(c)(1). By the same token, we note that we need not now decide whether that reasoning should be applied, in its full sweep, to the interpretation of "gross premiums"; petitioner has conceded that, to the extent that the deduction with respect to life insurance reserves represents the net valuation portion of due and deferred premiums, an equal amount should be included in "gross premiums" for the purpose of determining gain from operations subject to the so-called phase II tax. Accordingly, we now do no more than hold that the loading portion of due and deferred premiums should be excluded from "gross premiums" as that term is used in section 809(c)(1).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

SIMPSON, *J.*, dissenting: In my judgment, I would reach a different conclusion than the majority in this case, although I do not disagree with it in principle.

In his second opinion in the *Western National* case (51 T.C. 824 (1969)), Judge Drennen decided to construe the term "assets," as used in section 805, in the light of the industry practice; in doing so, he recognized that he was not adopting the common usage of that

---

[7] SEC. 809(c). GROSS AMOUNT.—For purposes of subsections (b)(1) and (2), the following items shall be taken into account:

(1) PREMIUMS.—The gross amount of premiums and other consideration (including advance premiums, deposits, fees, assessments, and consideration in respect of assuming liabilities under contracts not issued by the taxpayer) on insurance and annuity contracts (including contracts supplementary thereto) ; * * *

term and that he was not applying the traditional concepts of accrual accounting. The life insurance business involves many concepts and practices which are peculiar to that business, and the income which should be subject to taxation cannot be determined without taking into consideration those peculiar concepts and practices. It is, moreover, a business which is generally subject to regulation by the States, and through the National Association of Insurance Commissioners, uniform standards are established. Generally speaking, Congress has laid down the rules for determining the income of life insurance companies which is subject to Federal taxation, but in many respects, such income must be determined by reliance on the industry practices established in accordance with the regulations of the NAIC. In deciding to adopt the industry's concept of what constitutes an asset for purposes of section 805, I believe Judge Drennen acted wisely.

Nonetheless, I now believe that the time has come for us to abandon our own view of how the statute should be interpreted and to accept the views of the three Courts of Appeals. *Western National Life Insurance Co. of Texas* v. *Commissioner*, 432 F. 2d 298 (C.A. 5, 1970), reversing and remanding 50 T.C. 285 (1968) as modified by 51 T.C. 824 (1969); *Jefferson Standard Life Insurance Co.* v. *United States*, 408 F. 2d 842, 844 (C.A. 4, 1969); *Franklin Life Insurance Co.* v. *United States*, 399 F. 2d 757 (C.A. 7, 1968). Generally, it is our duty to decide a question in accordance with our best judgment. It would be irresponsible, in my opinion, for us to abrogate our own power to decide an issue and to accept the decision of another court merely because one other court had passed upon the question. Yet, we are not wholly free to expound the law as we may see it. Of course, we are constrained to give effect to our own precedents and to follow the decision of a circuit when the law has been established by decision of the Court of Appeals for that circuit. *Jack E. Golsen*, 54 T.C. 742 (1970), on appeal (C.A. 10, May 4, 1970). Even when the Court of Appeals has not spoken for the circuit in which the case arises, we do give serious consideration to the views of other circuits. At times, we may decide to continue to adhere to our view even though a Court of Appeals in a different circuit takes a different position. However, if many of the circuit courts adopt a position contrary to ours, there must come a time when we accede to their views, however much we may be convinced of the correctness of our view.

There is no magic in the number of three—there is no number of contrary decisions by the circuit courts which, in my view, should automatically cause us to accede to their views. When to abandon our view must depend upon the issue in controversy and other related circumstances. In this case, the issue is complex, and although I believe Judge Drennen's opinion was sound, I must recognize that it is dif-

ficult to make an overpowering argument for it. Under such circumstances, I believe that we should reconsider our position and accept the views of the circuits.

No one can predict with certainty how the Sixth Circuit will decide the issue, but we can be sure that they will give great weight to the views of the other Circuit Courts of Appeals. *Western National Life Insurance Co. of Texas* v. *Commissioner, supra; Goodenow* v. *Commissioner*, 238 F. 2d 20 (C.A. 8, 1956). In view of the nature of the issue in controversy, it is difficult to demonstrate that those circuits were clearly erroneous, and it is difficult to give cogent reasons why the Sixth Circuit should not follow them. It is most unlikely that the Sixth Circuit will not adopt the same position as the other circuits.

For us to persist in our view under such circumstances forces a party to further litigation, when it should not be necessary. In this case, the burden will be placed upon the Government, but in tomorrow's case, it might fall on the taxpayer.

QUEALY, *J.*, agrees with this dissent.